IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

Plaintiff,

v.                                                                    Case No. 6:12-CR-10210-JTM

MICHAEL J. McNAUL,
DALE C. LUCAS,
RUSSELL W. KILGARIFF,
LLOYD F. NUNNS,
GREGGORY A. KRAUSE,
STEVEN L. TALLMAN, and
FREDIE J. HEMBREE

Defendants.

## MEMORANDUM AND OMNIBUS ORDER

Defendants Michael J. McNaul, Dale C. Lucas, Russell W. Kilgariff, Lloyd F. Nunns,

Greggory A. Krause, Steven L. Tallman, and Fredie J. Hembree are charged with 71 counts in

the Superseding Indictment, including conspiracy to commit mail fraud, mail fraud, wire fraud,

money laundering, and bank fraud, in violation of 18 U.S.C. §§ 1349, 1341, 1343, 1957, and

1344, respectively.  This matter is now before the court on defendants' six motions (Dkts. 206,

207, 208, 210, 211, 230).

## I.       Factual and Procedural Background

The facts and circumstances of this case are, to say the very least, complex.  The charges

arise from a series of Joint Ventures allegedly created by defendants (and various combinations

thereof) for the purpose of purchasing, refurbishing, and leasing oil and natural gas drilling rigs

and associated equipment.  According to the government, defendants undertook a scheme to

entice people to invest in these Joint Ventures based upon certain representations and promises,

1

which the government now alleges were false.  Once an investment was made, defendants, instead of abiding by those representations and promises, allegedly caused the investors' funds to be diverted from the Joint Venture in which he or she intended to invest into another Joint Venture, without permission.  To further their scheme, after such transfers were made, defendants allegedly failed to inform their investors as to where and for what reason the funds had been transferred.  As a result, defendants allegedly obtained approximately $132,000,000.

On September 12, 2012, the grand jury returned a 67-count Indictment charging defendants with conspiracy to commit mail fraud (one count), mail fraud (nineteen counts), wire fraud (thirty-seven counts), money laundering (six counts), and bank fraud (one count).  Dkt. 1. On January 8, 2013, the grand jury returned a 71-count Superseding Indictment alleging an additional four counts of mail fraud.  Dkt. 83.  Defendants were arraigned and released on bond. Trial is currently set for August 3, 2015.[1]

## II.    Analysis

### A.    Defendants' Motions to Dismiss the Indictment (Dkts. 206 and 210)

Defendants challenge the Superseding Indictment on three basic grounds: (1) expiration of the statute of limitations, (2) sufficiency of the language, and (3) misrepresentation to the grand jury.

### 1.    Statute of Limitations

As a general rule, "[e]xcept as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed." 18 U.S.C. § 3282(a).  This general statute of limitations applies to charges of mail fraud and wire

---

[1] Because the original Indictment and the Superseding Indictment are largely identical, the balance of this opinion will simply refer to the documents as "the Indictment."

fraud. *See United States v. Ruedlinger*, 1997 WL 807917, at *1 (D. Kan. Dec. 9, 1997) (holding that "[t]he general five-year statute of limitations contained in 18 U.S.C. § 3282 ordinarily applies to charges of mail fraud"), *United States v. Mullins*, 613 F.3d 1273 (10th Cir. 2010) (holding that the default statute of limitations period provided in 18 U.S.C. § 3282 "applies to wire fraud charges").

**a.       Count 1: Conspiracy to Commit Mail Fraud**

Count 1 of the Indictment charges defendants with conspiracy to commit mail fraud, in violation of 18 U.S.C. § 1349. More specifically, Count 1 alleges that defendants "combined, conspired, and agreed to obtain money and other property by means of false and fraudulent pretenses, representations, and promises" and did so "by mailing prospective investors various documents which contained false and fraudulent representations and promises, and after the defendants had obtained money from investors, by causing to be mailed to such investors, false and fraudulent reports, updates, and profit and loss statements." Dkt. 83, at ¶ 55.

Although it is ambiguous as to the start date of this alleged conspiracy, the Indictment alleges that it continued through March 2008, a date which is based on the last known mailing to investors. In their motions to dismiss, defendants argue that the "continued through" language and the allegation that the last known mailing occurred in March 2008 are not enough to satisfy § 3282(a)'s five-year requirement. To maintain an action for conspiracy, defendants argue, the government must show that the alleged conspiracy was in existence on September 12, 2007 (five years before the Indictment), *and* that at least one "overt act" in furtherance of the conspiracy was performed after this date. The court disagrees.

Defendants rely on language from *Grunewald v. United States*, 353 U.S. 391 (1957). In that case, the defendants were convicted of conspiracy under 18 U.S.C. § 371 for conspiracy to

3

defraud the United States with reference to certain tax matters.  353 U.S. at 393.  The first question on appeal was whether an indictment was barred by the applicable three-year statute of limitations.  In its holding, the Supreme Court held that "where *substantiation of a conspiracy charge requires proof of an overt act*, it must be shown both that the conspiracy still subsisted within the three years prior to the return of the indictment, and that at least one overt act in furtherance of the conspiratorial agreement was performed within that period."  *Id*. at 396-97 (emphasis added).

Indeed, it has long been held that to prosecute a defendant under § 371, the government must prove "(1) an agreement; (2) to break the law; (3) *an overt act*; (4) the purpose of which is to further the object of the conspiracy; and (5) that the defendant entered the conspiracy willfully."  *United States v. Qayyum*, 451 F.3d 1214, 1218 (10th Cir. 2006) (emphasis added).  It makes sense then, that in prosecutions for conspiracy under § 371, the indictment must contain specific mention of an overt act in furtherance of the conspiracy that was performed within the requisite statute of limitations period.

This is not the case, however, with conspiracy charged under 18 U.S.C. § 1349.  In fact, the Tenth Circuit has held exactly the opposite: "convictions for the conspiracies . . . to commit money laundering and to commit wire and/or mail fraud do not 'require proof of an overt act in furtherance of the conspiracy.'"  *United States v. Thornburgh*, 645 F.3d 1197, 1204 (10th Cir. 2011) (quoting *Whitfield v. United States*, 543 U.S. 209, 219 (2005)).  Placing this holding within the context of the holding in *Gruenwald*, because substantiation of the conspiracy charge under § 1349 does *not* require proof of an overt act, it stands to reason that specific mention of such an overt act in an indictment is not particularly necessary and certainly not required.

Therefore, the government's mere allegation that the conspiracy existed in March 2008, which would place the filing of the Indictment within the requisite five-year time period, is sufficient to satisfy the statute of limitations. Accordingly, defendants' motions to dismiss Count 1 of the indictment are denied.

### b.    Counts 2-22, 69-71: Mail Fraud

Counts 2 through 22 and 69 through 71 charge defendants with mail fraud, in violation of 18 U.S.C. § 1341. Defendants again argue for dismissal of these charges based on the government's failure to abide by the applicable statute of limitations set forth in § 3282(a).

Although they pertain to different Joint Ventures, each count of mail fraud has, at its core, the following common language: "Beginning on a date unknown to the Grand Jury but continuing through the 11th day of March 2008 . . . ." Dkt. 82, at ¶¶ 57, 59, 61, 91. Defendants allege that the specific date alleged in the Indictment, March 11, 2008, occurred *after* all funds from the investors had been received and, as a result cannot be used for statute of limitations purposes. In other words, defendants would have this court believe that the statute of limitations period began to run on the last date that defendants received funds from investors. The court disagrees.

The Tenth Circuit most recently dealt with the statute of limitations and mail fraud in *United States v. Trammel*, 133 F.3d 1343 (10th Cir. 1998). In *Trammel*, the defendant, a licensed insurance agent, solicited funds from investors under the guise of selling annuities issued by various life insurance companies. 133 F.3d at 1347-48. In reality, the defendant never sent his clients' funds to the life insurance companies, instead spending the intended investment funds on unrelated personal and business expenses. *Id*. at 1348. As part of his scheme to defraud, the defendant sent his clients' children forms and letters for their signature after their

parents had sent the defendant money.  *Id*.  The defendant was ultimately convicted of mail fraud, wire fraud, and money laundering.  *Id*. at 1349.

On appeal, the defendant argued that the letters sent to his clients' children "did not further his alleged scheme because he had already obtained money from [the clients] when the letters were sent."  *Id*. at 1352.  The Tenth Circuit disagreed and held that

> [i]n a mail fraud case it is not necessary that the mailing predate the defendant's receipt of the money.  Mailings sent after the defendant has obtained the victim's money are considered "in furtherance of the scheme" for purposes of 18 U.S.C. § 1341 if they facilitate concealment of the scheme.  These mailings are commonly referred to as "lulling letters."  The Supreme Court has defined a "lulling letter" as a mailing that is designed to lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendant less likely than if no mailings had taken place.  To be part of the execution of the fraud . . . the use of the mails need not be an essential element of the scheme.  It is sufficient for the mailing to be incident to an essential part of the scheme or a step in the plot.

*Trammel*, 133 F.3d at 1352-53 (internal citations omitted).

Defendants argue that the key difference between *Trammel* and the case at bar is that the defendant in *Trammel* received funds, albeit from a single different investor, *after* the "lulling letters" were mailed to his original clients.  As such, those "lulling letters" could be considered to be in furtherance of the scheme to defraud for statute of limitations purposes.  The same cannot be said here, defendants argue, since no funds were obtained after the mailings; the "lulling letters" could not be in furtherance of the scheme because the scheme was already complete.

While this factual distinction does exist between *Trammel* and this case, it is not always the receipt of additional funds that makes the difference.  Consider, for example, the facts of *United States v. Sampson*, 371 U.S. 75, 80 (1962).  The defendants in *Sampson* purportedly worked to help businessmen obtain loans or sell out their businesses. In reality, however, they had really "deliberately planned and devised a well-integrated, long-range, and effective scheme

for the use of propaganda, salesmen, and other techniques to soften up and then cheat their victims one by one." *Sampson*, 371 U.S. at 77.   As part of this plan, and *after* having obtained their victims' money, the defendants mailed accepted applications, together with a form letter, "for the purpose of lulling said victims by representing that their applications had been accepted and that the defendants would therefore perform for said victims the valuable services which the defendants had falsely and fraudulently represented that they would perform." *Id*. at 78.   In *Sampson*, much as the allegations in the case at bar, it was allegedly a part of the defendants' scheme to compile financial data and forward it to various lending institutions and inform the victims of this action in an attempt to "convince them that they had not been defrauded and that the defendants were performing meaningful services on their behalves." *Id*.   In other words, the defendants actively used the mails to lull their victims into a false sense of security.

The *Sampson* defendants were ultimately indicted on mail fraud and conspiracy charges. The District Court, however, dismissed a majority of the mail fraud counts for failure to allege a federal offense.   According to the District Court, "since the money had already been obtained by the defendants before the acceptances were mailed, these mailings could not have been 'for the purpose of executing' the scheme." *Id*. at 79.

In support of its ruling, the District Court relied upon two cases: *Kann v. United States*, 323 U.S. 88 (1944), and *Parr v. United States*, 363 U.S. 370 (1960).   In both these cases, the mailings in question had been sent by a third party and were therefore found to be "immaterial" to the defendants and the scheme and were not deemed to be "lulling letters." *Id*. at 79-80.   On appeal, the Supreme Court held that although it had not found the mailings in *Kann* and *Parr* to be lulling letters, those decisions did not "lay[] down an automatic rule that a deliberate, planned use of the mails after the victims' money ha[s] been obtained can *never* be for the purposes of

executing the defendants'' scheme." *Sampson*, 371 U.S. at 80 (emphasis added).  As such, based on the facts before it, the Court reversed the District Court and held that "the indictment . . . alleged that the defendants' scheme contemplated from the start the commission of fraudulent activities which were to be and actually were carried out both before and after the money was obtained from the victims."  *Id*.  This was true even though, by the time of the mailings, the defendants had already obtained all the money from the victims.

The same is true here.  The government does not deny that, at the time of *some* of the mailings (and specifically those that occurred on March 11, 2008), defendants had already obtained all the funds from their victims.  However, it seems clear that, in order to maintain the fraud, defendants had to continually cover up what they had done, actions that were clearly *in furtherance of* the scheme to defraud.  It would make no sense for defendants to allegedly devise a scheme to defraud, obtain the funds, and then, in subsequent mandatory reports, point out that fraud to the very individuals who were victims thereof.  As noted in *Trammel* and as illustrated by *Sampson*, "[m]ailings sent after the defendant has obtained the victim's money are considered in furtherance of the scheme for purposes of 18 U.S.C. § 1341 if they facilitate concealment of the scheme." *Trammel*, 133 F.3d at 1352.

The court therefore finds that the mailings sent after defendants obtained all funds from the investors can qualify as part of the scheme to defraud since they were clearly done in furtherance of the scheme.  This being the case, if the last lulling letter was sent on March 11, 2008, the government had until March 11, 2013, to file charges for mail fraud.  The Indictment

was filed well within this time period.  Accordingly, defendants' motions to dismiss for failure to satisfy the statute of limitations on Counts 2 through 22, and 69 through 71 are denied.[2]

### c.    Counts 23-60: Wire Fraud

Counts 23 through 60 allege that

> On or about April 10, 2008, in the District of Kansas, the defendants . . . having devised, or intending to devise, a scheme or artifice to defraud, or for obtaining money or property by means of false and fraudulent pretenses, representations, and promises, transmitted, or caused to be transmitted, by means of wire, radio or television communication, in interstate commerce, writings, signs, signals, pictures, or sounds, for the purpose of executing such scheme or artifice, to wit . . . . Defendants . . . caused the following sums to be wired from one account to another . . . .

Dkt. 83, at ¶¶ 66, 69.

As noted above, the general five-year statute of limitations set forth in 18 U.S.C. § 3282(a) applies to wire fraud charges.  *Mullins*, 316 F.3d at 1278.  The analysis of defendants' statute of limitations argument with regard to the wire fraud charges is therefore identical to that performed for the mail fraud charges, *supra*, and need not be repeated here.  The Indictment alleges that a series of wire transfers took place between the Joint Ventures on April 10, 2008. Charges were therefore required to be filed by April 10, 2013.  The Indictment was filed on September 12, 2012, well within the requisite statute of limitations.  Accordingly, defendants' motions to dismiss Counts 23 through 60 for failure to satisfy the statute of limitations are denied.

### 2.    Sufficiency of the Indictment

The next set of defendants' claims concern the sufficiency of the Indictment itself.  By way of general summary, defendants allege that the entirety of the Indictment text is vague,

---

[2] The government concedes that the statute of limitations expired on Counts 10 through 14, as these Counts charge mailings which were mailed more than five years prior to the filing of the Indictment.  As such, Counts 10 through 14 are hereby dismissed.

unclear, and inherently flawed.  As such, it prevents defendants from understanding, with any kind of particularity or specificity, the exact charges against them.

As a general rule,

> Rule 7(c) of the Federal Rules of Criminal Procedure requires that an indictment be merely a plain, concise and definite written statement of the essential facts constituting the offense charged.  An indictment is held only to minimal constitutional standards, and the sufficiency of an indictment is judged by practical rather than technical considerations.  An indictment is sufficient if it contains the elements of the offense charged, putting the defendant on fair notice of the charge against which he must defend and if it enables a defendant to assert an acquittal or conviction in order to prevent being placed in jeopardy twice for the same offense.  It is generally sufficient that an indictment set forth an offense in the words of the statute itself, as long as those words themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offense intended to be punished.  The test of the validity of an indictment is not whether the indictment could have been framed in a more satisfactory manner, but whether it conforms to minimal constitutional standards.  Where a defendant challenges the sufficiency of an indictment for failure to state an offense, a court generally is bound by the factual allegations contained within the four corners of an indictment.  Courts, however, do not insist that any particular word or phrase be used in stating an essential element.

*United States v. Cooper*, 283 F. Supp. 2d 1215, 1231-32 (D. Kan. 2003) (internal citations and quotations omitted).

### a.    Count 1: Conspiracy to Commit Mail Fraud

With regard to Count 1, defendants generally allege that the Indictment fails to set forth the elements of the offense charged or put them on fair notice of the charges against which they must defend.  More specifically, defendants allege that Count 1 fails to incorporate the fifty-four prefatory paragraphs of the Indictment that set forth the alleged wrongdoings of defendants.  It also fails to incorporate any of the substantive mail fraud offenses with which defendants are charged (i.e., Counts 2 through 22 and 69 through 71).  Defendants argue that they are therefore left merely to speculate on such things as: (1) what particular false and fraudulent pretenses, representations, and promises were allegedly made by defendants; (2) what dates the mailings

were allegedly sent or by or to whom they were delivered; and (3) the details of the nature and scope of the alleged scheme.

The language of § 1349 is minimal: "[a]ny person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."  Unlike the general conspiracy statute found in 18 U.S.C. § 371, "a conspiracy to commit wire and/or mail fraud does not require proof of an overt act." *United States v. Fishman*, 645 F.3d 1175, 1187 (10th Cir. 2011) (citing *Whitfield v. United States*, 543 U.S. 209 (2005) (holding that criminal conspiracies modeled after the Sherman Act, 15 U.S.C. § 1, rather than 18 U.S.C. § 371, do not require proof of an overt act to obtain a conviction)).  It stands to reason, then, that an overt act need not be pled in the Indictment.  Indeed, to prove a conspiracy under § 1349, the government must demonstrate that: "(1) two or more persons agreed to violate the law, (2) the defendant knew the essential objectives of the conspiracy, (3) the defendant knowingly and voluntarily participated in the conspiracy, and (4) the alleged coconspirators were interdependent." *Id*. (quoting *United States v. Caldwell*, 560 F.3d 1214, 1218 (10th Cir. 2009)).

Count 1 charges, in relevant part, as follows:

> Beginning at a time unknown to the Grand Jury but continuing through March of 2008, in the District of Kansas, the defendants . . . and others known and unknown to the Grand Jury, combined, conspired, and agreed to obtain money and other property by means of false and fraudulent pretenses, representations, and promises.  The conspirators worked together to devise and execute the scheme by mailing prospective investors various documents which contained false and fraudulent representations and promises, and after the defendants had obtained money from investors, by causing to be mailed to such investors, false and fraudulent reports, updates, and profit and loss statements.  The defendants acted knowingly and unlawfully, and with the intent to defraud.

> To execute their scheme to defraud the conspirators, mailed and caused to be mailed "Brochures," "Joint Venture Agreements," "Application Agreement," reports, updates, profit and loss statements and other documents which contained

11

false and fraudulent promises and representations which the defendants knew to be false and fraudulent.   As a result of the defendants' false promises and representations, approximately $132,000,000.00 was invested in approximately 21 of the defendants' joint ventures.

Dkt. 83, at ¶ 55 (emphasis added).

Based on this language, the court finds the language of Count 1 satisfactory.  It alleges that: (1) two or more persons agreed to violate the law because they "combined, conspired, and agreed to obtain money and other property by means of false and fraudulent pretenses, representations, and promises;" (2) knew the essential objectives of the conspiracy and knowingly and voluntarily participated in the conspiracy because they "acted knowingly and unlawfully, with the intent to defraud;" and (3) were interdependent because they "worked together."

While the Indictment might have been more detailed, "[t]he test of the validity of the indictment is not whether the indictment could have been framed in a more satisfactory manner, but whether it conforms to minimal constitutional standards."  *Cooper*, 283 F. Supp. 2d at 1232. Therefore, defendants' motion to dismiss Count 1 of the Indictment based on insufficiency of the language is denied.[3]

### b.    Counts 2-22, 23-60, 69-71: Mail Fraud and Wire Fraud

The same holds true for mail fraud and wire fraud.  To establish guilt under 18 U.S.C. § 1341 for mail fraud, the government must prove that defendants: (1) engaged in a scheme or artifice to defraud or obtain money by means of false and fraudulent pretenses; (2) did so with the intent to defraud; and (3) used the United States mails to facilitate that scheme.  *United States*

---

[3] Defendants also allege that the mail fraud, wire fraud, and conspiracy to commit mail fraud statutes are unconstitutionally vague as applied.  Because this is an infirmity that infects all of the charges contained in the Indictment, including bank fraud and money laundering, defendants request that the Indictment be dismissed in its entirety.  Although framed as a constitutional argument, the court finds no actual difference between this argument and the general challenges to the sufficiency of the Indictment.  Indeed, it is unclear if defendants *are* making a separate argument from the general challenge.  Either way, the court denies defendants' motion to dismiss the Indictment on the ground that the statutes are vague as applied.

*v. Baldridge*, 559 F.3d 1126, 1140 (10th Cir. 2009) (quoting *United States v. Chavis*, 461 F.3d 1201, 1207 (10th Cir. 2006)).  To convict a defendant of wire fraud, the government must prove three elements: "(1) the defendant participated in a scheme to defraud; (2) the defendant intended to defraud; and (3) a use of an interstate wire in furtherance of the fraudulent scheme." *Fishman*, 645 F.3d at 1186 (quoting *Caldwell*, 560 F.3d at 1218).

With regard to mail fraud, the government alleges

Beginning on a date unknown to the Grand Jury but continuing through the 11th day of March, 2008, in the District of Kansas and elsewhere, the defendants . . . having devised and intending to devise a scheme and artifice to defraud, and for obtaining money or property by means of false and fraudulent pretenses, representations and promises, for the purpose of executing such scheme and artifice, or attempting to [do so]:

- Placed in a post office or authorized depository for mail matter, a matter or thing to be sent or delivered by the Postal Service; and

- Deposited, or caused to be deposited, a matter or thing to be sent or delivered by a private or commercial interstate carrier; and

- Took or received therefrom, any matter or thing; and

- Knowingly caused to be delivered by mail or such carrier according to the directions thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, a matter or thing; to wit:

After the defendants caused the transfer of funds invested in the below identified joint ventures to a company owned, operated, and controlled by the defendants. . . the defendants caused to be mailed reports, updates, and profit and loss statements which fraudulently failed to inform the investors of transfer of funds for the benefit of [the joint venture].  These mailing[s] occurred after the transfer of such funds, with the last such mailing occurring on the date identified below.

Dkt. 83, at ¶¶ 57, 59, 91.

It is very clear that the Indictment satisfies requirements two and three of charging under § 1341.  How defendants "*engaged* in a scheme or artifice to defraud or to obtain money by means of false and fraudulent pretenses" is somewhat less clear from the basic language of the

13

Indictment.  However, it stands to reason that if defendants *intended* to devise a scheme and

carried it out by using the mails, they *engaged* in such a scheme, thereby satisfying the necessary

requirements. As noted above, "the sufficiency of an indictment is judged by practical rather than

technical considerations."  *Cooper*, 283 F. Supp. 2d at 1231.

> With regard to wire fraud, counts 23 through 60, the Indictment alleges
>
> On or about April 10, 2008, in the District of Kansas, the defendants . . . having
> devised, or intending to devise, a scheme or artifice to defraud, or for obtaining
> money or property by means of false and fraudulent pretenses, representations,
> and promises, transmitted, or caused to be transmitted, by means of wire, radio or
> television communication, in interstate commerce, writings, signs, signals,
> pictures, or sounds, for the purpose of executing such scheme or artifice, to wit;
> on April 10, 2008, [the defendants] caused the following sums to be wired from
> one account to another account as set forth below.

Dkt. 83, at ¶¶ 66, 69.  The same analysis applied to the sufficiency of the mail fraud counts

applies here, as well.  The Indictment clearly sets forth that defendants intended to defraud and

did so using an interstate wire.  While it does not specifically state that defendants "participated"

in a scheme to defraud, it stands to reason that if defendants *intended* to participate and *actually*

used an interstate wire, they *participated* in the scheme.

While it was certainly possible for the government to allege, in more specific detail,

defendants' crimes, it was not required to do so.  Once again, "the test of the validity of an

indictment is not whether the indictment could have been framed in a more satisfactory manner,

but whether it conforms to minimal constitutional standards."  *Cooper*, 283 F. Supp. 2d at 1232.

Defendants expend a great deal of energy arguing that the specific amounts, transfers, and

accounts alleged in the Indictment do not actually exist or, at least exist in a somewhat different

manner, and that the government has turned "routine business activity" into a crime.  Dkt. 210, at

14.  Defendants further allege that, worse yet, the government has simply created out of thin air

this allegedly elaborate scheme to defraud.  Whether these accusations and argument carry any

14

weight is not for the court to decide now.  Defendants will have ample opportunity to present their version of their actions to a jury.

The court therefore finds the language in Counts 2 through 22, 23 through 60, and 69 through 71 to be sufficient.  Accordingly, defendants' motions to dismiss with regards to these counts are denied.

### c.   Counts 61-67: Money Laundering

To establish a violation under 18 U.S.C. § 1957 for money laundering, the government must show that: "(1) the defendant engage[d] or attempt[ed] to engage (2) in a monetary transaction (3) in criminally derived property (4) knowing that the property is derived from unlawful activity, and (5) the property is, in fact, derived from specified unlawful activity." *United States v. Wittig*, 568 F. Supp. 3d 1284, 1293 (D. Kan. 2008) (citing *United States v. Massey*, 48 F.3d 1560, 1565 (10th Cir. 1995)).

Counts 61 through 67 of the Indictment allege as follows:

> On the dates set forth below, in the District of Kansas, and elsewhere, the defendants . . . did knowingly engage in, or attempt to engage in a monetary transaction in criminally derived property of a value of greater than $10,000.00, which was derived from a specified unlawful activity, to wit: on or about the dates below the defendants engaged transfers of money from the bank account of Trace Drilling to the bank account of Pawnee Ironworks, LLC, with each such transfer being in excess of $10,000.00, and the funds of each such transaction had been derived as a result of mail fraud.

Dkt. 82, at ¶ 70.

Defendants present a myriad of questions as to how their role in this activity is even possible, given that Trace Drilling is allegedly a company that defendants neither own nor control.  Again, this is a question for the jury.  While the government could have provided more factual detail, it was not required to do so.  The Indictment contains sufficient information to

meet the minimal constitutional threshold required.  Accordingly, defendants' motion to dismiss

Counts 61 through 67 for insufficiency of the Indictment is denied.

### d.      Count 68: Bank Fraud

"The bank fraud statute contains virtually the same language as the federal mail and wire

fraud statutes, and, like those statutes, courts have construed the bank fraud statute liberally."

*United States v. Moser*, 2010 U.S. Dist. LEXIS 69543, at *14-15 (D. Kan. July 10, 2010)

(quoting *United States v. Young*, 952 F.2d 1252, 1255-56 (10th Cir. 1991)).  To prove bank

fraud, the government must prove that:

> (1) the defendant knowingly executed or attempted to execute a scheme . . . (ii) to
> obtain property by a means of false or fraudulent pretenses, representations or
> promises; (2) that the defendant did so with the intent to defraud; (3) that the
> financial institution was federally insured; and (4) the false or fraudulent
> pretenses, representations, or promises were material, meaning they would
> naturally tend to influence, or were capable of influencing the decision of the
> bank to obtain something of value, such as money.

*Id*. at *15 (quoting *United States v. Rackley*, 986 F.2d 1357, 1360-61 (10th Cir. 1993)).

> In Count 68 of the Indictment, the government alleges that defendants

> Knowingly executed, or attempted to execute, a scheme, or artifice to defraud, to
> obtain the money, funds, credits, securities, or other property owned by, or under
> the custody of a financial institution by means of false and fraudulent pretenses,
> representations, or promises, to wit:

> The defendants caused check number 1002, made payable to Alliance Leasing
> and in the amount of $600,000 to be drawn upon the account of Garner
> Management, knowing that the Garner Management account lacked sufficient
> funds to cover check number 1002, which the defendants then caused to be
> deposited into the account of Alliance LLC, thereby inflating the balance of the
> Alliance LLC account.  The defendants then caused Alliance LLC to issue a
> check number 1927, made payable to Pawnee Ironworks, in the amount of
> $600,000.00, thereby exposing Sunflower Bank to a possible loss of
> approximately $600,000.00.

Dkt. 83, at ¶82.  Previously in Count 68, the Indictment states that Sunflower Bank was insured

by the Federal Deposit Insurance Corporation.  Dkt. 83, at ¶ 71.

It is clear by the language of Count 82 that it includes the necessary elements to properly allege bank fraud pursuant to 18 U.S.C. § 1344. Accordingly, the court denies defendants' motion to dismiss the count on the grounds of insufficiency of the Indictment.

### 3. Misrepresentation to the Grand Jury

Finally, defendants allege that the government made serious misrepresentations to the grand jury which call into "significant question the credibility and integrity of the entire Indictment." Dkt. 210, at 3. More specifically, defendants draw attention to the fact that the amounts of the alleged transfers in paragraphs 47 and 48 of the Indictment, which form the basis of the mail fraud charges listed in Counts 2 through 9, do not actually exist. Rather, it has now been determined that the specific amounts listed in the Indictment are the pro rata source of funds that were ultimately transferred. Therefore, defendants allege,

> the grand jury process was adversely affected by withholding material information; namely that these transactions did not in fact occur, but instead were a concoction by the government to try to find something wrong that would artificially extend the statute of limitations. To accomplish this desired effect, the government created false impressions of the evidence to the grand jury and has stood silent before the Court and defendants as they have sought to understand the genesis of the charges against them.

Dkt. 210, at 5-6.

The government maintains that the evidence presented to the grand jury established that defendants transferred money belonging to the Joint Ventures identified in the Indictment to another Joint Venture and subsequently failed to report these transfers to the allegedly defrauded investors. This, the government claims "is the essence of the defendants' fraud," and any failure to advise the grand jury that the funds specified in the Indictment represented a *percentage* of the actual funds diverted does not invalidate the Indictment. The court agrees.

It has long been held that "[a]n indictment returned by a legally constituted and unbiased grand jury . . . if valid on its face, is enough to call for trial of the charge on the merits." *Costello v. United States*, 350 U.S. 359, 363 (1956).   Defendants make numerous and repetitive allegations about the sufficiency of the Indictment and, in this claim, about the sufficiency of the evidence presented to the grand jury.  What defendants do *not* allege, however, is that the grand jury was somehow illegally constituted and/or biased.   Absent this degree of allegation, defendants' claims simply do not bear weight.  After all,

> [i]f indictments were to be held open to challenge on the ground that there was inadequate or incompetent evidence before the grand jury, the resulting delay would be great indeed.  The result of such a rule would be that before trial on the merits a defendant could always insist on a kind of preliminary trial to determine the competency and adequacy of the evidence before the grand jury.

*Id*.

Therefore, defendants' motion to dismiss on the grounds of misrepresentation to the jury is denied.

**B.      Motions to Compel Production of Exculpatory Evidence (Dkts. 208, 211, and 230)**

In their Motions to Compel Release of Exculpatory Material, defendants seek disclosure of *Brady/Giglio* information, including:

1.  Exculpatory or favorable evidence regarding the alleged transfers of funds stated in paragraphs 47 and 48 and Counts 2 through 9:

> A.      Any and all documents which support the existence of the alleged funds transfers and transactions alleged in said paragraphs
>
> B.      Any and all documents explaining the amounts in Schedule C of Kurt Breitenbach's expert report
>
> C.      Any and all documents or other evidence identifying agreements and actions by any defendants who allegedly agreed to make the alleged transfers as part of a scheme to defraud

3.      Impeachment evidence

4.      Evidence of criminal investigation of any government witness

5.      Names of witnesses favorable to defendants

6.      *Giglio* information – leniency or promises of future leniency, including, but not limited to, any promise to file or consider filing a FED. R. CRIM. P. 35 motion

7.      Government examination of law enforcement personnel files

8.      SEC interview memoranda and notes

9.      Reports, records, and notes of interviews obtained by or for the Receiver

10.     FBI memoranda and notes

Dkts. 208, 211.

"The government has an affirmative duty to disclose evidence materially favorable to the defense under *Brady* and its progeny." *United States v. Vasquez-Garcia*, 2014 WL 7359490, at *16 (D. Kan. Dec. 23, 2014) (quoting *Browning v. Trammell*, 717 F.3d 1092, 1094 (10th Cir. 2013)). "Evidence is favorable if it is exculpatory or impeaching." *Id.* Evidence is subject to *Brady* disclosure if the defendant can "show the 'favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Browning*, 717 F.3d at 1095 (quoting *Kyles v. Whitley*, 514 U.S. 419, 435 (1995)). "[A] *Brady* request does not entitle a criminal defendant to embark upon an unwarranted fishing expedition through government files, nor does it mandate that a trial judge conduct an *in camera* inspection of the government's files in every case." *United States v. Phillips*, 854 F.2d 273, 278 (7th Cir. 1988); *accord United States v. Hughes*, 931 F.2d 63 (10th Cir. 1991) (unpublished).

With these principles in mind, the court denies defendants' motions. The government has acknowledged its obligations under *Brady* and *Giglio* and, indeed, has provided a comprehensive

list of items previously turned over to defendants.  It affirms that the "prosecution team has produced, or made available, every document and piece of physical evidence in its possession . . . ."  Dkt. 227, at 5-6.  The court has no reason to doubt that this is the case.

At the time of the parties' motions, the government asserted that it would produce all FBI 302s, SEC depositions, SEC declarations, any interview notes of interviews conducted on behalf of the Receiver in the underlying civil action, and any other material required to be turned over to defendants pursuant to the Jencks Act, 18 U.S.C. § 3500.  It also noted that it was in the process of requesting that the SEC provide all of its internal e-mails related to its civil investigation of defendants.  These matters have all been completed and the government has informed the court and defendants that it now has the balance of the SEC material and is in the process of going through it and will turn over any *Brady/Giglio* material as it is discovered.  The court takes the government at its word.

Defendants also make a specific request that the government turn over information which provides support, in one way or another, for the statements made in paragraphs 47 and 48 of the Superseding Indictment (see items 1A-C, listed above).  Although it is not entirely clear, this seems to be a request for material that may or may not be in the government's direct possession, for defendants state as follows: "[i]f this information is in the files of SA Ensz or someone at the Securities Exchange Commission or elsewhere in the hands of law enforcement, [defendants] are entitled to it."  Dkt. 208, at 4-5.

> *Brady* requires the government to disclose only the material exculpatory evidence that is in its possession.  Possession for *Brady* purposes is determined by several governing principles.  It is well settled that there is no affirmative duty upon the government to take action to discover information which it does not possess.  At the same time, what the government possesses is not determined only from what the prosecution has in its file.  A prosecutor's office cannot get around *Brady* by keeping itself in ignorance, or by compartmentalizing information about different aspects of a case.  If a federal prosecutor has knowledge of and access to

> exculpatory information as defined in *Brady* . . . then the prosecutor must disclose it to the defense.   A duty to search files maintained by governmental agencies closely aligned with the prosecution may be triggered when there is some reasonable prospect or notice of finding exculpatory evidence.   Mere possibilities or utter speculation will not give rise to this duty to search.   As the burden of the proposed examination rises, clearly the likelihood of a pay-off must also rise before the government can be put to the effort.

*United States v. Hernandez*, 1999 WL 318090, at *7 (D. Kan. Feb. 23, 1999) (internal citations omitted).

Again, as noted above, the government has assured this court that it has reached out to the identified agencies and obtained any additional information relevant to this case not already in its possession.   It is currently in the process of combing through it for any *Brady/Giglio* material and will promptly turn over any such material to defendants.   The court cannot ask the government to do any more than it has already done.

Defendants next seek disclosure of any impeachment evidence.

> With regard to 'impeachment' evidence, *Brady* does not require the government to provide any information that may impeach a witness' testimony, but instead requires that the impeachment information, like all *Brady* information, be material to the question of a defendant's guilt.   In other words, the evidence must be substantially impeaching so that, if disclosed and used effectively, it may make the difference between conviction and acquittal.   Moreover, if the impeachment evidence is merely cumulative, or a witness is but a minor part of the government's evidence, *Brady* does not require its disclosure.

*United States v. Ary*, 2005 U.S. Dist. LEXIS 21438, at *18 (D. Kan. Sept. 27, 2005) (internal citations omitted).

The government argues that disclosure of the requested impeachment evidence is premature, as it has not yet identified the witnesses who will testify in its case in chief.   Indeed, the case law supports the government's argument: "the government is generally required to disclose *Brady* and *Giglio* matters which relate to impeachment of a witness no later than five days before trial."   *United States v. Gregory*, 2005 U.S. Dist. LEXIS 19799, at *15 (D. Kan.

Sept. 12, 2005). This matter is currently set for trial August 3, 2015. Therefore, defendants' request for disclosure of impeachment materials is denied.

Finally, defendants seek SEC material that contains memoranda, reports, and notes of witness interviews. This information was initially requested by defendants and the government advised defendants that the information was privileged. At the March 16, 2015, status conference, the court ordered the government to obtain this material and provide any asserted privileged material *in camera* for the court's inspection. The court has reviewed the documents provided by the government which, for the most part, are nearly illegible handwritten notes created by SEC attorney Eric Werner. The court notes that defendants have received a bulk of the information contained within these documents. A majority of what was initially redacted is material specifically labeled "staff meeting," and is material over which the SEC primarily asserts an attorney work-product privilege.

> The work-product doctrine, which the Supreme Court of the United States first recognized in *Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947), shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case. In performing his various duties . . . it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel. Unlike the attorney-client privilege, the work-product doctrine is distinguishable from the testimonial privileges. The work-product doctrine is codified in rule 26(b)(3) of the Federal Rules of Civil Procedure and is therefore excepted from rule 501 of the Federal Rules of Evidence.
>
> . . . .
>
> The attorney work-product doctrine is intended only to guard against divulging the attorney's strategies and legal impressions. The work-product doctrine does not protect documents or other items that do not reflect the attorney's mental impressions.
>
> . . . .

The focus of the determination of whether a document falls within the work-product protection is whether the motivating purpose behind its creation was to aid in litigation or possible future litigation.

. . . .

Ordinary work product generally refers to materials that are gathered at the request of an attorney in anticipation of litigation. This type of work product receives less protection than opinion work product. Opinion work product is, basically, the mental impressions of the attorney. The party asserting the work-product protection has the burden of demonstrating that it applies and that it has not been waived.

. . . .

For the work-product doctrine to apply, the asserting party must show that the documents or materials were prepared in anticipation of litigation by or for a party or that party's representative. Litigation need not necessarily be imminent as long as the primary motivating purpose behind the creation of the document was to aid in possible future litigation. If the party asserting the work-product protection establishes entitlement to the protection, rule 26(b)(3) allows production of attorney work-product materials only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. The Tenth Circuit explained that work product can be opinion work product, which some courts have held to be absolutely privileged, or non-opinion work product, *i.e.,* fact work product, which may be discoverable under appropriate circumstances.

*S.E.C. v. Goldstone*, 301 F.R.D. 593, 65-52 (D.N.M. 2014).[4]

The dates of Werner's notes range from May 7, 2007, to May 9, 2008, and were, based on the content, clearly done in contemplation of the SEC's civil litigation against defendants. Defendants have not shown a substantial need for these materials. As such, all notes labeled "staff meeting" are undiscoverable. Defendants' request for production of these documents is denied.

---

[4] Although derived from civil rules and used primarily in civil litigation, the work-product doctrine also applies to criminal litigation. As the Supreme Court has noted, "[a]lthough the work-product doctrine most frequently is asserted as a bar to discovery in civil litigation, its role in assuring the proper functioning of the criminal justice system is even more vital. The interests of society and the accused in obtaining a fair and accurate resolution of the question of guilt or innocence demand that adequate safeguards assure the thorough preparation and presentation of each side of the case." *United States v. Nobles*, 422 U.S. 225, 236-37 (1975).

There are, however, several small portions of Werner's notes which do not appear to be work product and rather appear to be notes from interviews with individuals. These notes are those labeled by the government as "redacted" and are found on the following pages:

- FW-3147_NOTES_000429

- FW-3147_NOTES_000433

- FW-3147_NOTES_000488

- FW-3147_NOTES_000506

- FW-3147_NOTES_000541

The Government is therefore ordered to turn over only those specific portions.

In sum, defendants' requests for *Brady/Giglio* material is granted to the extent listed above but is otherwise denied as moot, as the government has assured this court that it has already turned over any and all such evidence and is in the process of going through any new material obtained from the SEC.[5]

---

[5] Defendant Hembree seeks to have the government specifically point out the following:

1. Each and every document, recording or field notes regarding any allegations in paragraphs 47 and 48 or Counts 2 through 9 which fail to mention Mr. Hembree.

2. Any and all grand jury testimony or law enforcement reports that contain favorable information:

    A. That does not identify Mr. Hembree or attribute acts, omissions or statements to him concerning the allegations of conspiracy, mail fraud and wire fraud in the Superseding Indictment;

    B. That the alleged mailings and wire transfers are not identifiable to Mr. Hembree.

Dkt. 208

While Defendant Hembree is certainly entitled to all *Brady/Giglio* material, he is not entitled to have the government hold his hand and specifically point out where he is or is not mentioned in what is likely thousands of pages of documents. Defendant Hembree's request is therefore denied.

**C.      Motion for James Hearing (Dkt. 207)**

Finally, defendants request a pretrial hearing pursuant to *United States v. James*, 590 F.2d 575, 579-80 (5th Cir. 1979), and for an order requiring the government to disclose, in advance of that hearing, all alleged co-conspirator statements it intends to offer in evidence at trial, pursuant to FED. R. EVID. 801(d)(2)(E).   Defendants anticipate, given the nature of this case, that the government will attempt to offer into evidence the alleged statements of co-conspirators, both indicted and unindicted, under the exception to the hearsay rule found at FED. R. EVID. 801(d)(2)(E).   These statements are thought to include those made by sales representatives, investors, and affiliate employees involved in promoting the Joint Ventures, acquisition, refurbishing, or management of the Joint Venture equipment, and investor funds paid in to the affiliated companies.

The government is in agreement that a *James* hearing is necessary.   Therefore, defendants' request is granted.   However, in response to defendants' motion, the government requested a pre-hearing status conference to discuss the parameters of the proceeding (Dkt. 235). This request is also granted.

**D.      Conclusion**

Defendants' Motions to Dismiss the Indictment (Dkts. 206, 210) are denied in their entirety.  Defendants' Motions to Compel Production of Exculpatory and Impeachment Evidence (Dkts. 208, 211, 230) are granted to the limited extent outlined above, but are otherwise denied as moot.  Defendants' Motions for a *James* hearing (Dkts. 207, 235) are granted.  The pre-*James* hearing status conference is set for **June 26, 2015, at 11:00 am**.  The *James* hearing is set for **June 29, 2015, at 1:00 pm**.

      **IT IS SO ORDERED** this 12th day of June, 2015.


                                                    s/J. Thomas Marten
                                                    J. THOMAS MARTEN
                                                    CHIEF JUDGE